## People's Bank *versus* Etting and Groome.

1. Where goods are in the possession of a bailee, notice of a pledge thereof by the owner, in order to render the bailee liable to the pledgee, in trover and conversion, for delivering the goods to a bona fide purchaser from the pledgor who took title discharged of the pledge, must be such as to convey information to the bailee or his authorized agent that the pledgee had loaned or would certainly loan money on the security of the goods.

2. Such notice cannot be proved or inferred from the testimony of an agent of the owner of the goods that at the time he obtained from the bailee's store-keeper a receipt showing that the goods were on storage (not a " warehouse receipt ") he told the storekeeper that " he wanted to borrow money on it," and " in his presence " indorsed such receipt to the order of a third party. Such evidence is insufficient to be submitted to a jury, from which to find such notice to the bailee of a pledge created after the obtaining of such receipt. The pledgee in such case should have protected himself by obtaining the transfer of a formal warehouse receipt, or by giving subsequent notice to the bailee of the fact of the pledge.

January 7th, 1885. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ. CLARK, J. absent.

ERROR to the Court of Common Pleas No. 4, of *Philadelphia county*: Of January Term, 1884, No. 216.

This was an action on the case in trover and conversion, by the People's Bank of Philadelphia against Edward J. Etting and Samuel W. Groome late trading under the name and firm of Edward J. Etting, to recover damages for certain iron of plaintiffs converted by defendants to their use, etc. Plea, not guilty.

On the trial, before ARNOLD, J., the following facts appeared:

The defendants were, in 1874–75, engaged in the business of storing and warehousing iron. They had an office at No. 105 Walnut street, and a storage wharf at the foot of Callowhill street, on the Delaware River, in the city of Philadelphia. At this wharf they employed one Gayley as foreman and weighmaster, whose duty it was to receive and store all iron delivered at the wharf, to sign receipts therefor to the persons delivering the same, to take receipts from persons to whom he delivered iron, to make entries in his books of such receipts and deliveries,

and to make daily reports to the defendants of all his transactions. He was not authorized to issue "warehouse receipts," which the defendants themselves issued at their office, and when so issued they notified Gayley thereof. The only sign at the wharf was a small one having on it the name "A. T. Gayley."

Henry G. Morris was an iron manufacturer in the city of Philadelphia; the function of purchasing iron and receiving and negotiating warehouse receipts, and attending to financial matters in his business, was entrusted by him to one Alexander Ervin, who acted in such matters as his confidential agent, under a general power of attorney from him.

On October 15th, 1874, the firm of Malin Brothers had on storage with the defendants Etting and Groome on their wharf in charge of Gayley, 300 tons of North Penn. pig iron, for which Malin Brothers gave to Ervin, for Morris, an order on Gayley. Ervin on that date took this order to Gayley, and asked him for a receipt for it, as he did not want to take it away at that time. Gayley testified that he "wrote a little receipt, showing that the amount of iron was there. Ervin read it over, and he said, 'That is not just what I want.' So he dictated this receipt, and I wrote it and signed it."

" *Philadelphia, October 15th,* 1874.

" Received from Malin Brothers three hundred tons (300) No. 1, Nth. Penn. pig iron on storage, subject to the order of Henry G. Morris.    AND. T. GAYLEY."

Ervin testified: At the time I asked for the receipt I told Mr. Gayley what I desired to do with it; that I wanted to borrow money on it. I turned it over in his office, in his presence, and made this indorsement on the back of it."

"A. T. Gayley, Esq.: Please deliver inclosed Pig Iron to W. H. Taber, Esq., cashier, or order.    HENRY G. MORRIS.
                              pp. ALEX ERVIN, *Attorney.*"

On October 20th, 1874, Erwin obtained from Malin Bros. another order on Gayley in favor of Henry G. Morris for additional iron stored on the wharf, which Ervin took to Gayley, and obtained from him the following receipt:

" *Philadelphia, October 20th,* 1874.

" Received from Malin Bros., 250 Tons No. 1 Nth. Penn. Pig Iron, 250 Tons No. 2 X Robbins' Pig Iron, held subject to the order of Henry G. Morris.    AND. T. GAYLEY."

Which Ervin testified that he indorsed "in Gayley's presence," thus :—

" Please deliver inclosed Pig Iron to W. H. Taber, or order.
                              HENRY G. MORRIS.
*October 20th,* '74.        pp. ALEX. ERVIN, *Attorney.*"

. Ervin's testimony as to what took place between him and Gayley when the receipts were given is fully recited in the opinion of this court. No one besides Ervin and Gayley was present at the two interviews above mentioned.

. . Gayley denied that Ervin indorsed the receipts in his presence, or told him that he wanted to borrow money on them. Gayley entered the transactions in his books. It did not appear whether he notified Etting & Groome of his having issued the receipts. Etting testified that Gayley's reports covering the period in question, between the 15th and 21st of October, 1874, had been lost.

Defendants objected to the admission in evidence of the above receipts :—

The Court: While I am of the opinion that the defendants are not bound by these receipts as warehouse receipts issued by them, nevertheless I think that they are the evidence of title of these plaintiffs to the iron sufficient to call upon the defendant to explain what became of the iron subsequently. For that purpose I admit them in evidence.

Ervin took these receipts on the days of their respective dates and pledged them with the People's Bank for a loan of $18,500 to Morris, which money was received by Ervin and by him deposited in a bank to the credit of Morris.

Subsequently Ervin applied to the defendants, Etting and Groome, and obtained from them formal warehouse receipts for the same iron, which he then again pledged, to the Philadelphia Warehouse Company, for a loan of $21,000, and afterwards he sold the iron to George M. Troutman, subject to the pledge to the Philadelphia Warehouse Company. Mr. Troutman who had no notice or knowledge of the claim of the People's Bank, paid the amount due the Philadelphia Warehouse Company and took up the warehouse receipt, which he surrendered for a new one.

Henry G. Morris afterwards failed whereupon the People's Bank after refusal by Gayley of their demand for the iron brought an action of replevin therefor against Gayley. When the deputy sheriff went to the wharf, in company with Ervin, it was found that the marks on the iron had been painted out, and only a portion of it was identified and taken by the sheriff.

Troutman then brought an action of replevin against the People's Bank, for the same iron. Both these suits were prosecuted to final judgment in the Supreme Court, wherein it was decided that the receipts issued by Gayley to Ervin were not " warehouse receipts," and that the property in the iron was in Troutman. (See 11 Norris, 518; 9 W. N. C., 49, 54; 12 Phila. Rep., 183, 186).

The present suit was then brought by the People's Bank against Etting and Groome, for having negligently converted the iron with notice (as alleged) that it was pledged to plaintiffs, by issuing the formal warehouse receipts by which Troutman obtained title to the iron.

At the close of the evidence the court directed the jury to find for the defendants, in the following charge:—

"In two trials of cases, involving the receipts offered in this case, it was decided by the Supreme Court that the Gayley receipts were not warehouse receipts, unless it could be shown that Mr. Gayley had authority to issue them for Mr. Etting. I do not find in this case any evidence that Mr. Gayley had authority to issue warehouse receipts, and I am unwilling to let the case go to the jury on this evidence, to find that there was an authority, express or implied. Again, even if he had such authority to issue warehouse receipts they should have been issued in the name of Etting, not Gayley. While they might be very good warehouse receipts so far as Gayley is concerned they are not warehouse receipts of Etting, because his name is not mentioned on their face. Therefore, the plaintiffs have no claim against Etting for negligence in twice issuing warehouse receipts for the same iron. [I admitted those receipts in evidence for the purpose of showing the inception of the title of the bank, which title ought to have been completed by giving notice to Mr. Etting. *There is no evidence of such notice in this case.* I therefore put the record in such a condition that it may be reviewed by the court in banc and the Supreme Court, and direct the jury to find the verdict for the defendants. This leaves the case in such a form that it can be reviewed thoroughly.]

Verdict, accordingly, for the defendants and judgment thereon. The plaintiff took this writ of error, assigning for error, inter alia, the instruction to the jury to find for the defendants, and that portion of the charge above included in brackets.

*Hood Gilpin, F. C. Brewster,* and *Charles Gilpin,* for the plaintiff in error.—Gayley was such an agent of the defendants that notice to him was notice to them; and we contend there was sufficient evidence to go to the jury that Gayley was notified by Ervin of the pledge to the People's Bank. Such notice to the person in possession as bailee is sufficient to make the bailee liable in trover and conversion to the pledgee if he subsequently delivers the property to another. It was therefore error to refuse to submit to the jury the question whether Gayley knew or had notice of the pledge to the People's Bank.

*W. Wynne Wister, Jr.,* and *R. C. McMurtrie,* for the defendants in error.—The only evidence by which it was pretended that the defendants were affected with notice of the so called pledge to the plaintiffs, was the testimony of Ervin. Assuming it to be true it is wholly insufficient to be submitted to a jury, from which to find notice to Gayley. He says he told Gayley he *wanted* to borrow money on the receipt: he did not name the proposed lender, nor did he ever notify him that he had carried out his wish. This does not constitute the slightest evidence, not even a scintilla, from which notice of the pledge to plaintiffs could be inferred: Mills *v.* Ball, 2 B. & Pul., 462; May *v.* Harvey, 13 East., 199; Solomons *v.* Dawes, 1 Esp., 83; Coore *v.* Callaway, 1 Id., 115; Alexander *v.* Southey, 5 B. & Ald., 247. The court below was therefore right in directing a verdict.

Mr. Justice GREEN delivered the opinion of the court, February 2d, 1885.

We held in People's Bank *v.* Gayley, 11 Norris, 518 that the receipts given by Gayley to Ervin for Morris were not warehouse receipts and consequently passed no title as such. When the bank, therefore, loaned its money upon these papers, it was not in a position to claim title under them distinctively as warehouse receipts. They were however sufficient to confer title as against either the bailee or a subsequent purchaser, provided those persons were affected by specific notice of the title of the bank, before the subsequent purchase was made or proper warehouse receipts issued by the bailee for the iron in question. It is just here that the radical difficulty in the plaintiffs' case lies. There is no adequate proof of such notice in the case. The testimony of Ervin is relied upon as proof of the notice. After a very careful examination of the whole of his testimony we fail to discover in it any proof of a character sufficient to make out the alleged notice of the title of the bank. He testified to the facts which transpired when he obtained from Gayley the first receipt for the 300 tons of iron and then said, "At the time I asked for the receipt I told Mr. Gayley what I desired to do with it; that I wanted to borrow money on it. I turned it over·in his office in his presence and made an indorsement on the back of it. That is the indorsement it now bears."

The indorsement is in these words "Please deliver enclosed Pig Iron to W. H. Taber, Esq. cashier, or order.

HENRY G. MORRIS,          pp. ALEX ERVIN, *Attorney.*"

The ·witness added: "I then took Mr. Gayley's receipt, with that indorsement on it to the People's Bank, and

handed it to Mr. Kemble the president." He then described
the second transaction thus: "Five days afterwards I went
to Mr. Gayley again, and finding that he had received the
balance of the iron he gave me another receipt for 500 tons.
This is the receipt. Again in his presence I made the indorse-
ment transferring the same to the People's Bank and I took it
away and delivered it to the People's Bank to Mr. Kemble as
president."

This is the testimony upon which the allegation of notice of
the title of the bank, to the present defendants is founded.
It is claimed that Gayley was the agent of the defendants and
notice to him was notice to them. But the difficulty is that
the testimony does not show notice to Gayley. A slight
analysis of the evidence proves this. All that the witness *said*
to Gayley was that he "wanted to borrow money on it."
This was but the declaration of a desire to borrow money in
the future from somebody who is not named. It was not even
an assertion that he would borrow money, but that he *wanted*
to do so. Of course what was to be done in the future might
not be done at all. Hence as a notice in the legal sense, of
something which had been done, or which certainly would be
done, the language of the witness proves nothing. Add to
this, what is still more requisite to make out notice of a par-
ticular title, that the possible lender of the money to be bor-
rowed, was not named at all, and it is seen at once how entirely
futile the alleged notice becomes. Of whose title was notice
thus given? Nobody's. But the witness made a further state-
ment. He said that he wrote the indorsement to the People's
Bank on the back of the receipt in Gayley's presence. If he
had said that Gayley looked on and saw the indorsement, or
that he handed it to Gayley to read and that he read it, or
that he read it himself to Gayley or that he told Gayley what
the indorsement was, it could well be said that notice of the
indorsement, and consequently notice of the probability of the
Bank's title subsequently accruing, was given. But there is
nothing of this kind to be found in the testimony of the witness,
and if notice is to be made out by this evidence it must be done
by inference alone. It is however too plain for argument that
it can not be done in that way. The reason is there are no
facts stated which justify the inference. Although Gayley was
present when the indorsement was written, it does not at all
follow that he had any knowledge of what was written. The
witness does not state where, in his presence, Gayley was,
when the indorsement was written; whether he was near by
or at some distance, whether he was sitting or standing,
whether he was in a position where he could see what the
witness was writing, or whether he looked at the writing as it

was made. How then can it be said that Gayley had knowledge of the indorsement? All these facts from which such knowledge might be inferred are absent from the testimony. We can not but feel that it would be most dangerous to permit a jury to infer a notice of this nature, from evidence of such a character, and we therefore think the learned court below was right in directing a verdict for the defendants. Had the Bank given notice of its title, to the defendants, as it had ample time to do, all its rights could have been saved. Or had it taken proper warehouse receipts it could have been protected, but neither of these things was done, and the loss of the iron was the resulting consequence. The view we have taken of the case renders unnecessary an examination of the several points made in the very able argument of the learned counsel for the plaintiff.

Judgment affirmed.